## Kerns v. Garman

C.P. of Berks County, no. 04-10779.

*Valerie West,* for plaintiff.
*Allan R. Kauffman,* for defendant.

LASH, *J.,* August 8, 2006—This court held a child custody trial on July 18 and 31, 2006. At issue is primary custody of the parties' minor child, Breyana L. Garman. The court makes the following findings of fact:

## I. FINDINGS OF FACT

(1) Plaintiff, Lacey Kerns (Mother), born September 19, 1979, is an adult individual residing at 217 Upland Avenue, Reading, Berks County, Pennsylvania.

(2) Defendant, Dennis Garman Jr. (Father), born July 24, 1977, is an adult individual residing at 29 N. State Street, Shillington, Berks County, Pennsylvania.

(3) Mother and Father are the natural parents of one child, Breyana L. Garman (Minor Child), born March 17, 2003.

(4) Mother and Father have never been married, but resided together at various times.

(5) The parties first resided together from some time in 2002 until August 6, 2004 at 227 South Wyomissing Avenue, Shillington, Berks County, Pennsylvania 19607. On August 6, 2004, both parties filed a petition for protection from abuse and received a temporary order from this court, based on allegations of an altercation occurring on August 3, 2004 at the parties' home. In the temporary protection from abuse order, the court set forth a temporary custody arrangement with Father having the Minor Child from Friday, August 6, 2004, until Sunday, August 8, 2004, at 8 p.m. and on Thursday, August 12, 2004, until Friday, August 13, 2004, with Mother having the Minor Child at all other times, until the protection from abuse hearing scheduled for August 13, 2004.

(6) On August 13, 2004, the parties agreed to reciprocal protection from abuse orders setting forth that neither party would have any contact with the other. Regarding custody, the parties agreed that Mother would have the Minor Child every Sunday from 7 p.m. until Tuesday at 7 p.m., Father would have the Minor Child every Tuesday from 7 p.m. until Thursday at 7 p.m., and the parties would alternate weekends. Mariah Chiccio would be an intermediary between the parties for custody purposes.

(7) Pursuant to the temporary protection from abuse order, Father was evicted from the parties' residence on August 6, 2004. At that time, he moved in with the paternal grandparents, Dennis and Louann Garman, at 1029 Fern Avenue, Kenhorst, Berks County, Pennsylvania 19607.

(8) On or about August 6, 2004, Mother filed a complaint for custody. This action resulted in the entry of a

custody order by agreement, entered September 8, 2004, which superseded the custody terms of the protection from abuse order. In the order of September 8, 2004, it was directed that the parties would share legal custody, that Mother would have primary custody, with Father having partial custody every weekend beginning Friday at 7 p.m. until Sunday at 6 p.m., every Thursday from 6 p.m. until 9 p.m., and every other Wednesday from 6 p.m. until 9 p.m. Provisions were also made for holidays and vacations.

(9) At or about the same time the custody agreement was being entered, the parties withdrew their respective protection from abuse orders against each other, with the orders to vacate being entered September 8, 2004.

(10) At some point in time, probably in the fall of 2004, the parties began residing together again, this time at 314 South Eighth Street, Reading, Berks County, Pennsylvania. The cohabitation continued until December 1, 2004, when the parties each filed a second protection from abuse petition against the other. Temporary orders were granted on December 1, 2004, and Father was evicted from the parties' residence. The custody arrangement did not change.

(11) On December 10, 2004, the court postponed the hearing on the protection from abuse petitions and amended the temporary protection from abuse order to provide specifics regarding the Christmas holiday and to permit Father to take the Minor Child to Florida over the Christmas vacation.

(12) The temporary protection from abuse order was again modified on January 28, 2005 to provide that the

parties shall exchange the Minor Child at a gas station on Lancaster Avenue in Reading, Pennsylvania, with Mariah Chiccio acting as intermediary.

(13) On or about February 24, 2005, Mother filed a petition to modify the custody order requesting that the order of September 8, 2004 be amended to permit her to have some time during the weekends.

(14) On or about March 31, 2005, Mother pleaded guilty to indirect criminal contempt of the PFA order against her, after being accused of violating the stalking clause by contacting Father via telephone on or about March 23, 2005.

(15) On April 29, 2005, after several continuances granted upon request of the parties, reciprocal protection from abuse orders were entered against both parties, prohibiting the parties from having contact with each other, except regarding custody exchanges. The terms of the order provided for expiration on October 29, 2006.

(16) On June 10, 2005, by agreement, the parties entered a temporary custody order providing that the parties would have joint legal custody, that Mother would have primary physical custody and that Father would have partial physical custody on alternate weekends from Friday after he finishes work until Sunday at 6 p.m. The order also directed that the parties would engage in co-parenting counseling with Anthony Horney, with Father to pay 55 percent of the cost and Mother 45 percent.

(17) On June 24, 2005, the parties amended the temporary custody order to include additional custody time for Father on Thursdays from 6 p.m. until 9 p.m.

(18) On July 1, 2005, Father filed a petition for special relief and motion to vacate the court order of June 24, 2005, requesting, among other things, that the original custody order of September 8, 2004 be reinstated.

(19) Even though the parties had protection from abuse orders entered against each other, during times in 2005, the parties spent some time residing together.

(20) On or about October 13, 2005, the parties were both arrested and charged with indirect criminal contempt after spending time together in the parking lot of Angelica Park in Reading, Berks County, Pennsylvania, in violation of the reciprocal protection from abuse orders. At that time, Father was searched by the police and methamphetamines were found in his possession. Both parties pleaded guilty to the indirect criminal contempt on October 20, 2005. Father was issued a fine on the drug possession.

(21) On or about October 14, 2005, the parties sought and obtained an order to vacate the protection from abuse orders entered against each other.

(22) Sometime in October 2005, Mother moved into the home of the paternal grandparents, although Mother and Father continued to be estranged.

(23) The parties again resumed cohabitation sometime in December 2005 and as a result, requested and received an order from this court entered December 13, 2005, dismissing defendant's petition for special relief and his motion to vacate the court order of June 24, 2005.

(24) In January 2006, Mother moved from the home of the paternal grandparents to her current residence at

217 Upland Avenue, Reading, Berks County, Pennsylvania.

(25) Even after Mother moved to her current residence, Mother and Father did continue to see each other. However, on April 9, 2006, after another argument, Father removed his belongings from Mother's residence. Within minutes after Father left Mother's residence, the paternal grandmother, Father's sister and Father's aunt arrived at Mother's residence and removed the Minor Child from Mother without her permission. According to Mother, the women assaulted Mother. Charges were filed by the police, which continue to be pending against the paternal grandmother and Father's aunt. Father's sister, Amy, pleaded guilty to interference with custody of a child.

(26) Mother filed a new protection from abuse action against Father on April 24, 2006, alleging that on April 13, 2006, Father attempted to influence Mother to drop the charges against his mother, sister and aunt. When Mother refused, he became verbally abusive, shoving and threatening her.

(27) Father responded by filing his own protection from abuse petition against Mother, alleging that on April 22, 2006, Mother has been verbally harassing and stalking him and his family constantly.

(28) Both of the latest protection from abuse petitions were withdrawn by the parties and the temporary orders vacated by agreement on April 28, 2006.

(29) Mother currently resides with the Minor Child and her other child, Matthew M. Hornberger, born December 1, 1998.

(30) Father currently resides with a friend, Justin Gardner, since July 1, 2006.

(31) Mother is currently employed by Day Springs Homes, since May of 2006. Her hours are Monday through Friday from 7 a.m. to 1:30 p.m., and alternate weekends from 9 a.m. to 9 p.m. on Saturday and 9 a.m. to 9 p.m. on Sunday. She is on call for emergencies. The weekends are the weekends she does not have custody of the Minor Child.

(32) Her job duties include providing care for developmentally disabled adults. She has received extensive training, including first aid, CPR, non-violence crisis intervention, and medical treatment training. She is a residential advisor, supervising staff.

(33) Previously, Mother was employed at Prospectus Berks, working there from 1999 to April of 2006. She was terminated from her employment because she refused to report to work, which she claims was because Father had an affair with a co-worker, who is also a friend of Mother's since Mother's childhood. Additionally, Mother borrowed a camera from the organization without permission and against policy.

(34) Father is currently employed by Amity Fence, working from 6:30 a.m. until approximately 4:30 p.m., Monday through Friday. Previously, he worked for Schlouch Inc., in construction, with similar hours.

(35) Other than when she resided with Father or with the paternal grandparents, Mother, for a short time, resided with a paramour, Reuben Rivera. For a time, she had a boyfriend, Larry Gaul Jr., however, she is currently not seeing anyone.

(36) The Minor Child is in general good health. There is a concern that she may have asthma or allergies, as she has difficulty breathing during the winter months.

(37) When Mother is unable to care for the Minor Child due to her work schedule, she has used her family members in the past, particularly her sisters, Tonya and Melissa. She has also used friends of hers. Currently, the Minor Child is enrolled at a day care known as the Academy for Early Learning.

(38) The paternal grandparents are very involved in watching the Minor Child. At Father's request, the paternal grandmother has come to the parties' residence on occasion to remove the Minor Child from the house when the parties were involved in an argument or altercation. The paternal grandfather has acted as an intermediary, transporting the Minor Child between the parties. When the paternal grandparents are unavailable, because they also work, Father's aunt and uncle, Jerry and Amy Garman, are available to care for the Minor Child.

(39) The maternal grandmother has some limited contact with the Minor Child, which has increased of late. Father objected to the maternal grandmother having any contact with the Minor Child because of his belief that the maternal grandmother mistreated the Minor Child on at least two occasions, first, when she put a pillow over the Minor Child's face to stop her from crying, and secondly, when she required the Minor Child to remain in a car seat for several hours, even though the Minor Child was extremely agitated. The maternal grandmother denies these allegations, arguing that she never placed

a pillow over the Minor Child's head, rather the Minor Child was involved in a temper tantrum banging her head against the floor and holding her breath. The maternal grandmother picked the Minor Child up to stop her from banging her head and flicked water in her face to stop her from holding her breath. Regarding the second incident, grandmother admits that she kept the Minor Child in the car seat, but claims that the Minor Child was asleep the whole time and further that keeping her in the car seat was necessary because the grandmother's basement was flooding from the recent floods, and the Minor Child being around that environment would have been unsanitary and unhealthy.

(40) Pursuant to a court order, a psychological evaluation was performed by Alison L. Hill Ph.D., of Berks Counseling Associates P.C. Dr. Hill evaluated the parties, the Minor Child, Mother's other son, Matthew Hornberger, and the paternal grandparents. Dr. Hill met with the parties on September 6, 2005, September 28, 2005, October 5, 2005, and October 17, 2005. Dr. Hill administered the Minnesota Multiphasic Personality Inventory-2 (MMPI-2), Parent Awareness Skills Survey (PASS) and Access Parent Self-Report Data Form. Subsequently, Dr. Hill prepared a written report, admitted into evidence as exhibit D-3.

## II. DISCUSSION

In making a determination on primary custody, this court considered the testimony of the parties, the paternal grandfather, Dennis Garman Sr., Mother's sister, Tonya Kerns, the testimony and written evaluation of Alison L.

Hill Ph.D., the questionnaires provided by the parties as directed by the court, and exhibits submitted.

Mother presented first, requesting that she retain primary custody and contending that Father's time with the Minor Child be supervised. She portrayed herself as providing all the necessary characteristics of a good mother. She believes she has bonded well with the Minor Child and her other child, Matthew. She loves both of them a great deal. She has always been the primary caretaker of the Minor Child, overseeing her feeding, diaper maintenance, toilet training, bathing, and providing all supervision when the Minor Child was in her care. She also enjoys and engages in recreational activities with the Minor Child. When she is unavailable, she believes she was careful to place the Minor Child with appropriate caretakers, including her two sisters, some friends, and lately, with the day care.

Throughout the Minor Child's life and even during her pregnancy, Mother was consistently employed full-time. Her employment, which requires her to provide extensive assistance to developmentally delayed adults, includes bathing, brushing teeth and otherwise maintaining the adults. This helped Mother to develop skills that can be transferred to the care of a minor child. Further, the training she has received, particularly on medical and emergency issues, would also serve her well in parenting.

The predominant theme of Mother's presentation, however, was Father's shortcomings. First, she claimed that Father chose to have very little involvement in the Minor Child's day-to-day maintenance. While the parties

were living together, Father was often unemployed and available to care for the Minor Child. Sometimes he did this, but more often he required Mother to obtain a babysitter. He refused to participate in the maintenance duties for the Minor Child, preferring to either relax or go out with his friends. When he did watch the Minor Child, as well as her other child, Matthew, he was neglectful. She would come home to find the house torn up and Father asleep. Additionally, she discovered that Father would let Matthew walk to school in the morning by himself so he could sleep. As a result, Mother hired a neighbor to oversee taking the children to school if she was unavailable due to her work schedule. Further, Father also refused to purchase anything for the Minor Child or provide child support.

Secondly, Mother claims that Father is engaged in alcohol and drug abuse. He would smoke marijuana cigarettes, as well as regular cigarettes, in the home despite her objection. Given the Minor Child's possible asthmatic condition, this could be harmful to her breathing. Father was involved in a motorcycle accident, which Mother claimed occurred because he was driving under the influence of alcohol. Mother believes that Father refuses to act responsibly with alcohol, and is involved in possession and even sales of illicit drugs.

Mother also contends that Father is both physically and verbally abusive to her. She has obtained several protection from abuse orders against him. She portrays herself as a battered woman who was constantly screamed at and sometimes beaten, due to Father's extreme temper and substance abuse. She believes the Minor Child is traumatized by the constant violence and screaming.

Mother stated that Father would often destroy items in the house, including breaking glass in the front door and the back door, putting a crack in the bathroom door by constantly punching into it, and, over the course of time, destroying approximately 13 phones, as it was his practice to pick them up and throw them when he was angry.

Mother alleges that Father refuses to communicate with her. She tried several methods, including direct communication in person or by telephone. She tried a communication book after being directed to use same by the court, none of which had any effect. She states Father would often respond to her inquiries by cursing at her or ignoring her.

Mother also believes that the paternal grandparents have caused problems for her and the Minor Child. She believes they are manipulative, attempting to orchestrate the custody arrangement to serve their purposes and Father's. She testified regarding an incident which she described as "kidnapping" when the paternal grandmother, Father's sister and his aunt came to her residence, shortly after Father had departed after collecting his belongings. Before Mother was able to get out of her car, the three women converged on her, assaulting her, and removed the Minor Child from the car seat. The automobile drifted into another vehicle during the course of this altercation. Ultimately, Mother was unable to see her Minor Child for approximately four days. Charges were filed against the women, resulting in a guilty plea by Father's sister, with the other charges still pending.

Mother's sister, Tonya, supports Mother's assertions. Tonya temporarily resided with the parties and she testi-

fied that she observed Mother being physically assaulted by Father. She testified to Father being constantly verbally abusive toward Mother. She stated that the paternal grandmother would come to the house without Mother's knowledge and take the Minor Child from the residence at Father's request during some of these altercations. Tonya also testified that one day while the parties were away, she discovered a bag of cocaine in plain view in the ceiling of the basement. After confronting the parties, it became clear to Tonya that the cocaine belonged to Father, as he made no pretense of denying the knowledge of its existence or that it was his, but demanded it back because "he needed to make a profit with it." She also testified to his laziness, by relating a bizarre practice where Father would urinate into an empty ice tea container and leave the container sitting around with urine inside, rather than take the time to use the bathroom facilities.

Father presented in much the same manner as Mother, also requesting primary custody of the Minor Child. He related his love for the Minor Child and his desire to have as much time with the Minor Child as possible. When she is with him, he places his entire focus on her, playing with her and otherwise interacting. He reads to her extensively. He testified that he provides all of the important maintenance activities, even when he resided with the paternal grandparents. He applies appropriate discipline when necessary.

Father had extensive complaints about Mother's care of the Minor Child. He believes that she is either neglectful, or worse, abusive, testifying that the Minor Child has been returned to him on several occasions with lumps

on her head or black and blue eyes. There was one occasion when she had a burn on her hand, which Mother claimed occurred when the Minor Child fell on a lamp at a campground. Father claims the Minor Child's hygiene is poor when he receives the Minor Child from Mother, that she has diaper rash and infections, and does not appear to have been washed properly.

Father claims that Mother does not provide proper parenting, acting more like a sister than a mother, teasing the Minor Child, as well as her half brother, Matthew, and engaging in dangerous fun, such as swinging the Minor Child around. He believes that Mother is unstable, moving several times, and being involved in several short-term relationships. She often delegates care of the children to her sisters or friends, who have established themselves to be poor caretakers. According to Father, Mother's sister, Melissa, sleeps rather than watch the Minor Child. Melissa also had a boyfriend who has a criminal background. Generally, Father believes that Mother is willing to expose the Minor Child to individuals who are of questionable character and will not provide proper attention to the Minor Child.

Father argues that Mother is extremely volatile and sparks the altercations. The incident involving Father's family started after Father told Mother of a court proceeding that was coming up. According to Father, Mother became inconsolable, threatening suicide, and was totally out of control. Father chose to leave, but shortly thereafter, the paternal grandmother, Father's sister and aunt arrived and took the Minor Child from Mother "for the child's own safety."

Father denies many of the allegations Mother asserted, including that he smokes in the house around the Minor Child, that he continues to use drugs, that he was inattentive to the Minor Child and refused to provide any care or maintenance when the parties resided together, or that he physically or verbally abused Mother.

The paternal grandfather testified and supported Father's position. The paternal grandfather believes that the Minor Child does not want to live with Mother, and that it is very difficult for him to turn the Minor Child over to her when required. The thrust of his testimony is that he and the paternal grandmother have often had to "rescue" the Minor Child from Mother, her instability or her neglect. Grandfather believes that Father is an appropriate caretaker, loves the Minor Child a great deal and should be awarded primary custody. Grandfather disputes many of the allegations Mother has asserted against Father, including extensive drug use.

The psychologist, Dr. Hill, recommended that the parties share both legal and physical custody of the Minor Child. The parties should alternate weekends, and the weekday time should be split as evenly as possible. Due to the Minor Child's tender age, she should have as much contact with both parents as possible, never going more than two or three days without contact with the other parent. Dr. Hill also mandated that the parties should participate in co-parenting counseling. She also recommended that Mother take a parenting education class and that the Minor Child should participate in play therapy.

In making her recommendation, Dr. Hill found that the Minor Child has bonded well with both parties, but

otherwise found problems with both parties, in general, and with Mother, in particular. She found that Mother can be manipulative and selectively report information, that she tends to rationalize her own behavior, deny conflict and repress her emotions. Dr. Hill noted that Mother is impulsive and lacks inhibition when she becomes frustrated or upset. She may engage in maladaptive or unacceptable behavior, then rationalize the behavior. Dr. Hill opined that Mother displayed minimal understandings of child development issues and appropriate behavior at different stages. "She would sometimes offer consequences for unacceptable behavior, but they were often not meaningful enough, such as simply speaking to an 11-year-old who has stolen money. Sometimes the consequences that she suggested inadvertently reinforced the behavior, such as giving a food treat to a 5-year-old child who is having a temper tantrum in a grocery store."[1] Dr. Hill was also concerned about Mother's choice of caretakers.

Dr. Hill also stated that Mother's general parenting skills are fair. To her credit, Mother has maintained stable employment.

In critiquing, Dr. Hill accepts Father's statements that he assumes primary caretaking responsibility for the Minor Child during his periods of partial custody and that he is dedicated to the well-being of the Minor Child. She notes his strong backup with the paternal grandparents, as well as the aunt and uncle, to help out when necessary. However, Father's personality profile reveals

---

1. Psychological evaluation of Alison L. Hill Ph.D., at p. 16.

an underlying depression, along with suspicious and paranoid thought processes. He tends to hold resentments, becoming critical and angry, and can verbally attack others, which can cause difficulties in interpersonal relationships.

At issue is primary physical custody. The paramount concern in a child custody proceeding is the best interests of the child. *Costello v. Costello,* 446 Pa. Super. 371, 375, 666 A.2d 1096, 1098 (1995). A determination of what is in the best interests of a child is made on a case-by-case basis and must be premised upon consideration of all factors which legitimately have an effect upon a child's physical, intellectual, moral and spiritual well-being. *Alfred v. Braxton,* 442 Pa. Super. 381, 385, 659 A.2d 1040, 1042 (1995).

The most striking features of the parties' profiles are the substantial negative characteristics, many of which are shared equally. Both parties can be impulsive, irrational and immature. Both have quick and harsh tempers, which can lead to physical altercations. Each blames the other for all the problems and refuses to take any responsibility for his/her behavior. Both are capable of breaking the law. Both give little regard to court orders or the costs to the taxpayers for their constant burdening of the court system or the police. Both are capable of gross exaggerations and intentional lying, appearing to have done so to Dr. Hill and to this court while under oath, to the extent that it is difficult to get a clear and truthful picture of the circumstances.

In viewing Dr. Hill's report, it appears that she obtained a good reading on Mother's characteristics, amply listing

her shortcomings. However, regarding Father, Dr. Hill's acuity was not as demonstrated. It is apparent from the record that Father has substantial issues with drugs and alcohol, which should be addressed. Some of the things Mother complains about, such as Father smoking in the house, which is a concern for an asthmatic child, likely does happen, as Father does not appear to be overly concerned about the ramifications of his behavior. This reflects a level of immaturity, failure to be accountable or to accept responsibility for his actions. This perspective nearly got him killed when he was operating a motorcycle while under the influence of alcohol.

The paternal grandparents are an important and integral part of the Minor Child's life and need to continue to be included in the Minor Child's upbringing. They also have a good handle on Mother's shortcomings, but as parents often do, they minimize their own son's behavior. Further, the paternal grandmother's involvement in the taking of the Minor Child during the "kidnapping" incident was wholly inappropriate and likely traumatized the Minor Child. If the paternal grandmother was concerned that Mother was temporarily incapable of caring for the Minor Child due to her own extreme emotion, the paternal grandmother had several legitimate remedies, including the police, Children and Youth Services, or the court. Instead, she now faces criminal charges for her actions.

It is very important that the parties learn to treat each other in an adult and civil manner. Most importantly, for the sake of the Minor Child, they must act as good parents. This court will mandate co-parenting counseling.

The court previously ordered same, but Father, in the usual fashion common to both parties, disregarded the court's mandate. That will now change. If either party refuses to attend the co-parenting counseling as ordered, the court, upon proof of that party's failure, shall impose substantial sanctions which may involve extensive fines and community service, as appropriate.

There is one positive feature about Mother's parenting, which separates her from Father. She has been the primary caretaker since the Minor Child's birth, doing so while she maintained full-time employment. She was even working during her pregnancy. This is in contrast to Father, who appeared very willing to let Mother take care of the Minor Child while he partied with his friends or relaxed at home. This court believes that when the Minor Child is in Father's care, the paternal grandparents assume most of the parenting duties, not Father. Accordingly, it appears that the current custody arrangement with Mother having primary custody and Father having alternate weekends and evenings continues to be appropriate.

Father needs to establish a commitment to the difficult duties involved in parenting. Both parties need to extensively overhaul their lifestyles to eliminate the fussing, backbiting, temper tantrums, police involvement, and all other drama. We can already see the fruit of their actions through the Minor Child. She has begun acting out through serious temper tantrums, including holding her breath and banging her head on the floor. This action was likely learned from her parents. Hopefully, before the Minor Child turns 18, the parents will be willing to teach her some other, more suitable behavior.

562

We enter the following order:

## ORDER

And now, August 8, 2006, after trial held, custody of the parties' Minor Child, Breyana L. Garman, born March 17, 2003, shall be as follows:

(1) The parties shall share legal custody.

(2) Plaintiff, Lacy Kerns (Mother), shall have primary physical custody of the Minor Child.

(3) Defendant, Dennis Garman Jr. (Father), shall have partial physical custody of the Minor Child on alternate weekends from Friday after work until Sunday at 6 p.m., every Thursday from 6 p.m. to 9 p.m., and at such other times as the parties may agree.

(4) Mother shall have custody on Mother's Day and Father on Father's Day each year from 10 a.m. to 6 p.m.

(5) The parties shall share the following named holidays with the custodial parent having custody from 10 a.m. to 6 p.m., with Father having the next holiday after the date of this order: Easter, Memorial Day, July 4th, Labor Day and Thanksgiving.

(6) The parties shall alternate the Christmas holiday with one parent having custody from 6 p.m. on December 24 until 1 p.m. on December 25, and the other parent having custody from 1 p.m. on December 25 until 6 p.m. on December 26. Father shall have custody for the first time period and Mother for the second time period on odd-numbered years, with the parties to reverse the time periods on even-numbered years.

(7) The parties shall have the right to one week of vacation each summer with the Minor Child. Each party shall provide the other party with at least 30 days advance notice of their choice of week under this paragraph. Mother's choice of week shall take priority in the odd-numbered years and Father's choice shall take priority in the even-numbered years.

(8) The parties shall equally share transportation for custody transfers by meeting at the Giant located in Shillington.

(9) The parties shall enroll in co-parenting counseling with Anthony Horney. The parties are to be responsible for the costs with Father paying 55 percent and Mother paying 45 percent. The parties shall follow any and all recommendations of Anthony Horney.

(10) The attached appendix shall be made a part of the within order.

## APPENDIX TO ORDER

Certain rules of conduct which generally apply to custody matters are set forth below and are binding on both parties, the breach of which could become the subject of contempt proceedings before this court, or could constitute grounds for modification of this order. If these general rules conflict with any specific provisions of the order, the order shall prevail.

(1) In addition to the foregoing rights, both parties shall also have the following rights with respect to the child:

(A) The right to reasonable telephone contact with the child when he or she is in the other parent's custody.

(B) The right to be fully informed concerning the progress of the child in school and the child's medical status, including the right to obtain the necessary information directly from the child's school or medical practitioner; and

(C) The right to be informed in advance before any important decisions are made concerning the child and the opportunity to participate in those decisions.

(2) In the event of any serious illness of the child at any time, any party then having custody of the child shall immediately communicate with the other party by telephone or by any other means, informing the other party as to the nature of such illness, and during such illness, each party shall have the right to visit the child as he or she desires consistent with the proper medical care of the child.

(3) Neither party shall alienate nor permit to attempt to alienate the child from the other party. While in the presence of the child, neither parent shall make any remarks or do anything which is derogatory or uncomplimentary to the other and it shall be the duty of each parent to uphold the other parent as one the child should respect and love.

(4) Both parties shall provide each other with their addresses and telephone numbers of their residences and any time they take a trip with the child out of the jurisdiction of Berks County in excess of three days.

(5) The parties shall not conduct arguments or heated conversation when they are together in the presence of their child.

(6) The parties shall, at all times, consider the children/child's best interests, and act accordingly. It is in a child's best interest to understand that he or she is trying to desperately cope with the fact of his or her parents' separation, and needs help in loving both parents, rather than interference or censure.

(7) Neither party shall question the child as to the personal lives of the other parent except insofar as necessary to insure the personal safety of the child. By this we mean that the child will not be used as a spy on the other party. It is harmful to a child to be put in the role of spy.

(8) The parties should remember that they cannot teach their child proper moral conduct by indulging in improper conduct themselves. Children are quick to recognize hypocrisy, and the parent who maintains a double standard will lose the respect of his or her child.

(9) Weekend and evening visitation shall be subject to:

(A) Arrangements will be worked out beforehand between the parties without forcing the child to make choices and run the risk of parental displeasure. However, the child shall be consulted as to his or her schedule when appropriate.

(B) Visitation rights shall be exercised at reasonable hours and under circumstances reasonably acceptable to the other party and to the need and desire of the Minor Child.

(C) If a party finds himself or herself unable to keep an appointment, he or she should give immediate notice to the other party, so as to avoid subjecting the child to unnecessary apprehension and failure of expectations.

(D) The party having custody of the child should prepare him or her both physically and mentally for the transfer of custody to the other party and have him or her available at the time and place mutually agreed upon.

(E) If either party or a child has plans which conflict with a scheduled visit and wish to change such visitation, the parties should make arrangements for an adjustment acceptable to the schedules of everyone involved. Predetermined schedules are not written in stone, and both parties should be flexible for the sake of the child.

(F) If a party shows up for a visit under the influence of alcohol or drugs, the visit may be considered forfeited on those grounds alone.

(10) If either party feels the other party has violated this order, they may petition the court as set forth in Pa.R.C.P. 1915.12.